## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARIE GASTON,

        Plaintiff,

v.                            Case No.  04-2368-DJW

WARREN PLOEGER, et al.,

        Defendants.

### <u>MEMORANDUM AND ORDER</u>

This is a 42 U.S.C. §1983 civil rights action with supplemental state law claims arising out of the suicide of Jeffrey Ray Belden ("Belden") on August 14, 2002 while incarcerated in the Brown County, Kansas jail.  Plaintiff, Administratrix of the Estate of Jeffrey Ray Belden, allege Defendants violated Belden's constitutional rights by being deliberately indifferent to his medical needs.  Plaintiff further asserts common law negligence and wrongful death claims.

Currently pending before the Court is Defendants' Motion for Summary Judgment (doc. 30).  As explained below, Defendants' motion is granted in part and denied in part.  Specifically, the Motion is granted with respect to Plaintiff's constitutional claims against Defendants Ploeger, Leitch and Steve Roberts.  Defendants' Motion is denied, however, with respect to Plaintiff's constitutional claims against Defendants Shoemaker, Hollister and Brandon Roberts, as well as Plaintiff's negligence and wrongful death claims against all Defendants.

I. **Facts**

The following facts are taken from the summary judgment record and are either uncontroverted or viewed in the light most favorable to Plaintiff's case. Immaterial facts and facts not properly supported by the record are omitted.

1. Defendants Warren Ploeger, Glen Leitch and Steve Roberts are County Commissioners of Brown County, Kansas.

2. The Brown County, Kansas Board of County Commissioners are duly elected and a governing entity of Brown County, Kansas.

3. Defendant Lamar Shoemaker is employed as the Sheriff of Brown County, Kansas.

4. Sheriff Shoemaker has the ultimate responsibility for how the jail is run.

5. Defendant Sergeant Brett Hollister is employed as the jail administrator within the Brown County, Kansas Sheriff's Department.

6. During the relevant time period, Defendant Brandon Roberts was employed as a jailer within the Brown County, Kansas Sheriff's Department.

7. On June 26, 2002, Belden was incarcerated in the Brown County Jail for possession of methamphetamine with intent to sell.

8. Although Belden's Brown County Jail cell mates at various times had heard Belden talk about suicide, observed him give away his food, watched him repeatedly rock back and forth on his bed, and noticed him tying his shoelaces together to test the ability of the shoelaces to hold his body weight, there is no evidence that this was ever conveyed to any of the Defendants.

9. On August 14, 2002, Belden received a letter from his then fiancée.

10. Defendant Hollister has had training in identifying inmates with suicidal tendencies.

11. Sometime during the afternoon on August 14, 2002, Sergeant Hollister placed Belden in a single person cell because Belden was suspected of receiving contraband and/or a letter through a cell window.

12.     After being placed in a single person cell, Belden plugged that cell's toilet with a fruit and flooded the cell floor. As a result of the flooded floor, Belden was moved to another single person cell.

13.     Officer Roberts came on duty at 4:00 p.m. and was informed that Belden was in an individual cell for disciplinary reasons.

14.     Around 5:30 p.m., Belden threw the drink from his meal in the jail hallway and then refused to return to his cell as instructed by Officer Roberts.

15.     After this incident, Deputy Brammer assisted Officer Roberts in placing Belden back in his cell.

16.     Officer Roberts allegedly had to threaten Belden with force and pepper spray in order to place Belden back in his cell.

17.     Sometime between the hours of 5:30 p.m. and 6:20 p.m, Belden placed paper over his cell window.

18.     Officer Roberts' next jail check was at 6:40 p.m., at which time Officer Roberts noticed that Belden had placed paper over his cell window. Officer Roberts instructed Belden to remove the paper from his cell window but Belden refused and threatened Officer Roberts if Roberts came into the cell.

19.     Officer Roberts testified that jail policy permits an inmate to temporarily obstruct the view into his or her cell.

20.     Officer Roberts testified that he got along well with Belden prior to this day and that this type of behavior was out of character for Belden.

21.     Sergeant Hollister stated in his deposition that a sudden change in an inmate's behavior is a clue of a possible suicide.

22.     Officer Roberts called Sergeant Hollister regarding Belden's actions and Sergeant Hollister directed Officer Roberts as follows:

        •       let dispatch know that Roberts needed a second officer to come in;

        •       when the second officer arrived, Roberts and the second officer were to go together to remove the paper from Belden's cell door window; and

        •       after removing the paper, Roberts and the second officer were to move Belden to cell 14.

3

23.    Cell number 14 was the suicide watch cell at the Brown County Jail.

24.    Officer Roberts was aware that cell 14 was the suicide prevention cell.

25.    Inmates in cell 14 were to be observed every fifteen minutes.

26.    Other than cell 14, jail procedures require that inmates be observed every one hour.

27.    Officer Roberts testified that after calling Sergeant Hollister, he notified dispatch to call for another officer to come to the jail to assist with Belden.

28.    The jail log prepared by Officer Roberts on the day of Belden's suicide

   •    does not include any reference to Roberts contacting dispatch and requesting a road deputy to come in and assist him in removing the paper from Belden's cell door window; and

   •    does include a statement from Roberts indicating that he was waiting for Deputy Brammer to come back to the jail from his dinner break and assist him in removing the paper from Belden's cell door window.

29.    Sergeant Hollister states that if, in fact, Officer Roberts did request the dispatcher call for a second officer to come in, that request should have been indicated on Roberts' log.

30.    Former Deputy Doug Brammer, who was on duty during the relevant time period, states  he was never notified by dispatch or anyone else that Officer Roberts had requested assistance.

31.    Sheriff Shoemaker testified that both the Hiawatha Police Department and the Kansas Highway Patrol are available to respond to emergency situations at the jail.

32.    At 7:45 p.m., Officer Roberts did another jail check. Officer Roberts told Belden to take the paper off of his window.  Belden allegedly told him to "fuck off."

33. Although approximately one hour had passed since Officer Roberts' alleged request to have dispatch call for a second officer,

    •   Roberts did not follow up with the dispatcher to see why a second officer had not shown up;

    •   Roberts did not call his supervisor Sergeant Hollister back to update him of on the situation; and

    •   Roberts did not call one of the Hiawatha City Police Department officers or Kansas Highway Patrolmen to assist him.

34. Sheriff Shoemaker testified that in the facts of this case, where Brandon Roberts was busy with laundry and waiting for assistance, it would be understandable for the paper obstruction on Belden's window to be in place as long as it was.

35. Sergeant Hollister and Officer Roberts were aware that Belden had been an inmate in the Brown County Jail for several weeks and that Belden was not a disciplinary problem until August 14, 2002, the day Belden committed suicide.

36. Sergeant Hollister did not call back to the jail and check with Officer Roberts to determine if the situation was under control and/or if Officer Roberts was able to secure the services of another officer to remove the barrier from Belden's cell.

37. At approximately 8:00 p.m., on August 14, 2002, Deputy Brammer returned to the Sheriff's office to work on paperwork.

38. Shortly after 8:00 p.m. on August 14, 2002, Officer Roberts discovered Belden hanging from his cell door handle.

39. At approximately 8:18 p.m., Deputy Brammer heard the dispatcher call the ambulance to the jail for an unknown situation with an inmate. Deputy Brammer went downstairs in the jail and was told by Officer Roberts that Belden had tried to hang himself.

40. Upon arrival, the emergency room physician at the hospital was told that Belden was on one-half hour cell check.

41. Defendant Shoemaker has had training in identifying inmates demonstrating suicidal tendencies.

42.     Defendant Roberts testified that

- he did not receive any formal training of any type at the Brown County Jail and specifically did not receive any formal suicide prevention training;

- he was never given any training formally or informally relating to clues to look for to determine if an inmate was at risk for suicide;

- any information he did learn about suicide prevention and actions, he learned from other officers at the jail while on the job; and

- he was informally told that suicidal inmates might act depressed. Other than depression, however, Brandon Roberts does not remember any other signs to look for to determine if an inmate is suicidal.

43.     Brown County has established procedures for handling inmates demonstrating suicidal tendencies. The essence of those procedures is that once an inmate demonstrates any indication of considering self harm, Kanza Mental Health is called to the jail and evaluates the inmate. The inmate is then isolated or watched or secured, depending upon the circumstances and the evaluation.

## II.     Summary Judgment Standards

        Summary judgment is appropriate if the moving party demonstrates there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[1]  The Court must view the evidence and all reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmoving party.[2]  A fact is material if, under the applicable substantive law,

_____

        [1]Fed. R. Civ. P. 56(c).

        [2]*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

6

it is essential to the proper disposition of the claim.[3] An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. [4]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law.[5]  In meeting that standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the other party's claim, but must simply point out to the court that the other party lacks evidence on an essential element of its claim.[6]  Once the movant has met this initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its allegations to satisfy its burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[10]

---

[3]*Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

[4]*Id*.

[5]*Id.* at 670-71 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

[6]*Id.* at 671 (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548).

[7]*Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *accord Adler*, 144 F.3d at 671.

[8]*Id.*; *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

[9]*Adler*, 144 F.3d at 671 (internal quotation omitted).

[10]*Id.*

Finally, it must be noted that summary judgment is no longer regarded as a disfavored procedural shortcut.  Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[11]

## III.   <u>Analysis</u>

Plaintiff seeks relief under 42 U.S.C. § 1983, alleging that Defendants violated Belden's rights under the Cruel and Unusual Punishments Clause of the Eighth Amendment to the United States Constitution (as applied to the states by virtue of the Due Process Clause of the Fourteenth Amendment), by being deliberately indifferent to a substantial risk that Belden would attempt to commit suicide.  Plaintiff also asserts negligence and wrongful death claims under Kansas state law. Defendants seek summary judgment on all of Plaintiff's claims.

### A.   **Plaintiff's Section 1983 Claims**

#### 1.   **Individual Capacity Claims**

In order to maintain these claims, Plaintiff must first offer sufficient facts to raise a genuine issue of material fact regarding whether these Defendants violated Belden's constitutional rights. In other words, the Court first must determine whether there are sufficient facts that a jury could find that these Defendants were deliberately indifferent to a substantial risk that Belden would attempt to commit suicide.  Second, Plaintiff must prove that these Defendants are not entitled to qualified immunity for their actions.[12]

---

[11]*Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed. R. Civ. P. 1).

[12]*See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (stating court must first examine whether defendant's alleged conduct violated constitutional right and, second, whether right was clearly established); *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997) (plaintiff first must show conduct violated a constitutional right and, second, that the right violated was clearly established such that reasonable person in defendant's position would have known the conduct violated right).

### a.    Deliberate Indifference

Plaintiff's claims are brought pursuant to the Due Process Clause of the Fourteenth Amendment.  This is because pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment.[13]  In determining whether Belden's rights were violated, however, the Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to section 1983.[14]

An inmate's Eighth Amendment rights are violated when a prison official shows deliberate indifference to the inmate's serious medical needs.[15] Claims arising from a jail suicide "are considered and  treated as claims based on the failure of jail officials to provide medical care for those in their custody."[16]  Under that standard, the plaintiff must prove that the defendant was deliberately indifferent to a substantial risk that the inmate might attempt to commit suicide.[17]

In *Farmer v. Brennan*,[18] the Supreme Court set forth a two-part framework for evaluating constitutional claims premised upon prison officials' alleged deliberate indifference to a substantial risk of serious harm to an inmate.[19] First, a constitutional violation occurs only if the deprivation

---

[13]*Lopez*, 172 F.3d at 759 n.2 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)).

[14]*Id.* (citation omitted).

[15]*Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

[16]*Barrie v. Grand County*, 119 F.3d 862, 866 (10th Cir. 1997).

[17]*Id.* at 869.

[18]511 U.S. 825 (1994).

[19]*Id.* at 828.

alleged is "objectively, sufficiently serious."[20]  For a claim based on a failure to prevent harm, a person must show that he is being detained or incarcerated "under conditions posing a substantial risk of serious harm."[21] A substantial risk of suicide is certainly a serious harm and, therefore, satisfies the first prong of *Farmer*.

Second, an official must have a "sufficiently culpable state of mind."[22]  Under this standard, "an official or municipality acts with deliberate indifference if its conduct (or adopted policy) disregards a known or obvious risk that is very likely to result in a violation of a prisoner's constitutional rights."[23]  Deliberate indifference requires "a higher degree of fault than negligence, or even gross negligence."[24]  More specifically, the *Berry* court held that in order to establish deliberate indifference to an inmate's safety, the plaintiff must show

- actual knowledge of the specific risk of harm or that the risk was so substantial or pervasive that knowledge can be inferred;

- failure to take reasonable measures to avert the harm; and

- that failure to take such measures in light of the knowledge, actual or inferred, justifies liability for the attendant consequences of the conduct, even though unintended.[25]

These elements were found by the Tenth Circuit to apply in a prisoner suicide case as well.[26]

---

[20]*Id.* at 834 (citation omitted).

[21]*Id.*

[22]*Id.*

[23]*Berry v. City of Muskogee*, 900 F.2d 1489, 1495 (10th Cir. 1990).

[24]*Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 & n.7 (1989)).

[25]*Id.* at 1498.

[26]*Estate of Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir.1994).

### (1)    Defendant Commissioners Ploeger, Leitch and Roberts

Defendants Warren Ploeger, Glen Leitch and Steve Roberts are County Commissioners of Brown County, Kansas.   In her Complaint, Plaintiff contends these three individuals were deliberately indifferent and negligent with regard to protecting the rights and safety of Belden and ignored the risk of Belden taking his own life.   The Court finds Plaintiff fails to support these allegations with any evidence connecting these three individuals to Belden's suicide or the events leading up to his suicide.   Because Plaintiff fails to identify a legal or factual basis for imposing section 1983 liability on the Brown County Commissioners in their individual capacity, the Court will enter summary judgment in favor of these Defendants on Plaintiff's section 1983 claims.

### (2)    Sheriff Shoemaker

Because Plaintiff has presented no evidence that Defendant Sheriff Shoemaker was personally involved in the events leading up to Belden's suicide, the only colorable basis for Sheriff Shoemaker's liability arises from his status as a supervisor.   "A supervisor is not liable under section 1983 unless an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise."[27] A supervisor must have participated in or acquiesced in the constitutional violation of the prisoner to be held liable.[28]   The supervisor must have acted with deliberate indifference, rather than mere

---

[27]*Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988) (internal citations and quotation marks omitted).

[28]*Id.* at 1528.

11

negligence.[29]  In order to be guilty of deliberate indifference, the supervisor must know that he is creating a substantial risk of bodily harm.[30]

To the extent that Plaintiff argues Shoemaker failed to adequately train jail personnel, Plaintiff (1) must identify a specific deficiency in Shoemaker's training that is closely related to Belden's ultimate injury; and (2) must prove that the deficiency in training actually caused jail personnel to act with deliberate indifference to Belden's safety.  In this case, the Court finds Plaintiff has presented sufficient evidence that a jury could find an affirmative link between the constitutional deprivation alleged and Shoemaker's training practices and general exercise of control over the jail.

Sheriff Shoemaker is responsible for all aspects of the Brown County Jail.  Brandon Roberts testified that he did not receive any formal training of any type at the Brown County Jail and he specifically did not receive any formal suicide prevention training.  Roberts further states that he was never given any training formally or informally relating to clues to look for to determine if an inmate was at risk for suicide.  Roberts indicated that any information he did learn about suicide prevention and actions, he learned from other officers at the jail while on the job.  Roberts testified that he was informally told that suicidal inmates might act depressed.  Other than depression, however, Brandon Roberts does not remember any other signs to look for to determine if an inmate is suicidal.

In this case, Plaintiff has presented sufficient evidence of constitutional violations by Sergeant Hollister and Brandon Roberts.  Moreover, Plaintiff has presented sufficient evidence to demonstrate that the policies and practices promulgated by Sheriff Shoemaker with regard to training could very well have been the moving force behind these alleged constitutional violations.  In other

---

[29]*Green v. Branson,* 108 F.3d 1296, 1302 (10th Cir. 1997).

[30]*Id.*

words, a jury could find from the evidence presented that Sheriff Shoemaker's policies, procedures, and practices reflect deliberate indifference to the a known risk that the jail will inevitably house suicidal inmates.

### (3)    Sergeant Hollister and Officer Brandon Roberts

As specifically set forth below, the Court finds that the evidence presented raises a genuine issue of material fact regarding whether Plaintiff can establish the first prong necessary in order to prove Defendant Hollister and Roberts were deliberately indifferent;; in other words, (1) whether Defendant Hollister and Roberts had knowledge of the specific risk that Belden would attempt to commit suicide; or (2) whether the evidence demonstrates that the risk of Belden committing suicide was so substantial or pervasive that knowledge by these two Defendants can be inferred.

On or around August 14, 2002, Belden's cell mates heard Belden talk about suicide, observed him give away his food, watched him repeatedly rock back and forth on his bed, and noticed him tying his shoelaces together to test the ability of the shoelaces to hold his body weight.  Although there is no evidence that Hollister or Roberts had actual knowledge of these particular facts, such Defendants were aware that Belden had been an inmate in the Brown County Jail for several weeks and that Belden was not a disciplinary problem until August 14, 2002, the day Belden committed suicide.

Belden received a letter from his then fiancée on the day of his suicide.  This letter apparently upset Belden and there is evidence to suggest that Sergeant Hollister was aware of the receipt and contents of the letter.  More specifically, there is evidence to demonstrate that Sergeant Hollister placed Belden in a single person cell because Belden was suspected of receiving contraband and/or

this letter through a window from his cell.  Defendant Hollister has had formal training in identifying inmates demonstrating suicidal tendencies.

After being placed in a single person cell, Belden plugged that cell's toilet with a fruit and flooded the cell floor.  As a result of the flooded floor, Sergeant Hollister had Belden moved to another single person cell.  Officer Brandon Roberts came on duty at 4:00 p.m. and was informed by Sergeant Hollister that Belden was in an individual cell for disciplinary reasons.  Around 5:30 p.m., Belden threw the drink from his meal in the jail hallway and then refused to return to his cell as instructed by Officer Roberts. After this incident, Deputy Brammer assisted Officer Roberts in placing Belden back in his cell.  Officer Roberts ultimately had to threaten Belden with force and pepper spray in order to place Belden back in his cell.

Sometime between the hours of 5:30 p.m. and 6:20 p.m, Belden placed paper over his cell window.  Officer Roberts' next jail check was at 6:40 p.m., at which time Officer Roberts noticed that Belden had placed paper over his cell window.  Officer Roberts instructed Belden to remove the paper from his cell window but Belden refused and threatened Officer Roberts if Roberts came into the cell.  Roberts testified that he got along well with Belden prior to this day and that this type of behavior was out of character for Belden.  Sergeant Hollister stated in his deposition that a sudden change in an inmate's behavior is a clue of a possible suicide.

Officer Roberts called Sergeant Hollister regarding Belden's actions and Sergeant Hollister specifically directed Officer Roberts as follows:

14

- let dispatch know that Officer Roberts needed a second officer to come in;

- when the second officer arrived, Officer Roberts and the second officer were to go together to remove the paper from Belden's cell door window; and

- after removing the paper, Officer Roberts and the second officer were to move Belden to cell 14.

Cell number 14 is the suicide watch cell at the Brown County Jail. Officer Roberts was aware that cell 14 was the suicide prevention cell. Jail policy provided that inmates in cell 14 were required to be observed every fifteen minutes. Other than cell 14, jail procedures require that inmates be observed every one hour.

Officer Roberts testified that after calling Sergeant Hollister, he notified dispatch to call for another officer to come to the jail to assist with Belden. The jail log prepared by Officer Roberts on the day of Belden's suicide, however, does not include any reference to Officer Roberts contacting dispatch to request assistance in removing the paper from Belden's cell door window. Sergeant Hollister states that if, in fact, Officer Roberts did request the dispatcher call for a second officer to come in, that said request should have been indicated on Roberts' log. Former Deputy Doug Brammer, who was on duty during the relevant time period, states he was never notified by dispatch or anyone else that Officer Roberts had requested assistance.

Notably, and at odds with Officer Roberts testimony, the jail log does include a statement from Officer Roberts indicating that he was waiting for Deputy Brammer to come back to the jail from his dinner break and assist him in removing the paper from Belden's cell door window. Moreover, the facts establish that although approximately one hour had passed since Officer Roberts' allegedly requested dispatch to call for a second officer, Roberts did not follow up with the dispatcher to see why a second officer had not shown up, did not follow up with his supervisor

Sergeant Hollister to update him on the situation and did not call one of the Hiawatha City Police Department officers or Kansas Highway Patrolmen to assist him.

Sergeant Hollister did not call back to the jail and check with Officer Roberts to determine if the situation was under control and/or if Officer Roberts was able to secure the services of another officer to remove the barrier from Belden's cell window.

At 7:45 p.m., Officer Roberts did another jail check.  Officer Roberts told Belden to take the paper off of his window.  Belden allegedly told him to "fuck off."  Shortly after 8:00 p.m. on August 14, 2002, Officer Roberts discovered Belden hanging from his cell door handle.  Upon arrival, the emergency room physician at the hospital was told that Belden was on one-half hour cell check.  All other inmates were on one hour cell checks.

Notwithstanding the assertions of Sergeant Hollister and Officer Roberts that they had no idea that there was a substantial risk Belden might commit suicide, the Court finds that the evidence presented above creates a genuine issue of material fact regarding whether the risk of Belden committing suicide was  so substantial or pervasive that the knowledge can be inferred.  Moreover, there is sufficient evidence that a jury could find that Sergeant Hollister and Officer Roberts failed to take reasonable measures to avert Belden's suicide and that the failure to take such measures in light of the knowledge, albeit inferred, justifies liability for the attendant consequences of Hollister and Roberts' conduct, regardless of whether such consequences were intended.  More specifically, the Court concludes there is sufficient evidence that a jury could determine that

- if the jailers had been properly monitoring the inmates, the jailers would have heard Belden talk about suicide, would have observed Belden give away his food, would have watched Belden repeatedly rock back and forth on his bed, and would have noticed Belden tying his shoelaces together to test the ability of the shoelaces to hold his body weight;

- Belden's change in behavior on August 14 was drastic compared to the prior six weeks, which should have raised suspicion that something was wrong;

- Officer Roberts was instructed to place Belden in cell 14, which was the suicide prevention cell, but this task was not accomplished in an expedient or reasonable fashion;

- Officer Roberts was instructed to notify dispatch that he needed assistance to remove the obstruction from Belden's cell, but Officer Roberts failed to do so;

- Regardless of whether the obstruction was removed, Belden should have – and could have – been monitored every half-hour, but was not; and

- Belden was allowed to remain in his cell with his window covered, which obstructed any observation into his cell, for at least approximately two hours and that such conduct is prohibited by jail policy and/or practices.

Based on the evidence presented, the Court concludes there is sufficient evidence that a jury could find that Belden was exhibiting strong signs of suicidal tendencies, that these two jail officials had actual – or inferred – knowledge of, or were willfully blind to, the specific risk that Belden would commit suicide, and that these jail officials then failed to take steps to address that known, specific risk.

### b.    Qualified Immunity

In light of the Court's finding that Plaintiff has submitted sufficient evidence to allow a jury to find alleged constitutional violations by Defendants Shoemaker, Hollister and Roberts, the Court must now turn to their claims of qualified immunity.  If their conduct violated "clearly established

statutory or constitutional rights of which a reasonable person would have known," then they are not entitled to qualified immunity.[31]

The law is "clearly established" for purposes of the qualified immunity inquiry if there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts . . . found the law to be as plaintiff maintains."[32]  Moreover, the law must have been clearly established at the time of the alleged deprivation of the plaintiff's rights.[33]  A plaintiff need not present an identical case, but, rather, "must show only that the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."[34]  In other words, the law must be such that a reasonable official would have understood that his conduct was unlawful in the situation he confronted.[35]  The key to the qualified immunity inquiry is not whether a directly on-point case exists, but, rather, whether prior case law would provide prison officials with "fair warning" that their conduct was unlawful.

The Court has little doubt that Shoemaker, Hollister and Brandon Roberts had fair warning that it would be unlawful to be deliberately indifferent to a known – whether such knowledge is actual or inferred – risk that Belden would try to commit suicide. In 1997, the Tenth Circuit recognized an inmate's (and a pretrial detainee's) established right to medical attention once the

---

[31]*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982) (citation omitted).

[32]*Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

[33]*Warner v. Grand County*, 57 F.3d 962, 964 (10th Cir. 1995).

[34]*Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1241 (10th Cir. 1999) (internal quotations omitted).

[35]*Saucier v. Katz,* 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed.2d 272 (2001).

prisoner's suicidal tendencies are known.[36]  Further, in 1994, the Supreme Court recognized that once prison officials know of a substantial risk of serious harm to an inmate, those prison officials can avoid liability if they "respond[ ] reasonably" to abate that risk.[37]  Based on this precedent, the Court concludes that on August 14, 2002, reasonable prison officials would have clearly understood that they were under an affirmative duty to take reasonable measures to abate the known risk that Belden was suicidal.[38]

In sum, viewing the evidence in the light most favorable to the Plaintiff, the conduct of Shoemaker, Hollister and Brandon Roberts violated Belden's constitutionally protected right to medical care for his serious medical needs.  Further, that constitutional right was clearly established such that a reasonable official, at the time of Belden's suicide, would have understood that his behavior violated that right.  Therefore, Shoemaker, Hollister and Brandon Roberts are not entitled to qualified immunity on Plaintiff's section 1983 claims.

### 2.   Official Capacity Claims

#### a.   Brown County Commissioners Ploeger, Leitch and Roberts

A local governing body may be sued directly under section 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation,

---

[36]*See, generally, Barrie v. Grand County*, 119 F.3d 862 (10th Cir. 1997).

[37]*Farmer v. Brennan*, 511 U.S. 825, 844, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994).

[38]For example, in *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001), the Sixth Circuit pointed to Supreme Court opinions as well as to precedent in the Sixth Circuit that is in all relevant respects analogous to the applicable precedent from the Tenth Circuit. The Sixth Circuit overruled the prison officials' claims of qualified immunity and concluded that based on Supreme Court and Sixth Circuit precedent, the defendant "would have clearly understood that [he] was under an affirmative duty to offer reasonable medical care to a prisoner whom he knew to be  suicidal, in the circumstances confronted by [the defendant]." *Id.* at 711 (internal quotation omitted).

or decision officially adopted and promulgated by the body's officers."[39]  In other words, to survive summary judgment, Plaintiff must submit evidence to support the allegation that any and all wrongful acts by jail personnel were carried out pursuant to a policy or custom adopted by the Brown County Commissioners.

To that end, the factual contentions within the Pretrial Order contain the following allegations by Plaintiff against Defendants Ploeger, Leitch, and Roberts as Brown County Commissioners:

> Defendants County Commissioners of Brown County, Kansas were deliberately indifferent and negligent with regard to protecting the rights and safety of Jeffrey Ray Belden and ignored the risk of Jeffrey Ray Belden taking his own life, by:
>
> •     not providing adequate facilities;
>
> •     not implementing, instituting, and maintaining proper procedures to fully protect Jeffrey Ray Belden;
>
> •     not adequately supervising jail employees;
>
> •     not providing properly trained jail personnel; and
>
> •     not properly guarding Jeffrey Ray Belden while he was an inmate at the Brown County Jail.
>
> Defendants' actions and failure to act resulted in Jeffrey Ray Belden's death. Defendants were aware of the suicide prevention deficiencies at the Brown County Jail but ignored them. Defendants were aware of the suicidal tendencies of Jeffrey Ray Belden but ignored them.[40]

In conjunction with these allegations, Plaintiff contends the Commissioners are responsible for the funding of the Brown County Jail and its operations, and thus it is incumbent upon the Commissioners to see that the facilities and funding are proper to provide an environment where the

---

[39]*Monell v. New York City Dep't of Social Serv.*, 436 U.S 658, 690 (1978).

[40]Pretrial Order, ¶5a(1) at pp. 6-7 (doc. 27).

inmates of the Brown County Jail are safe and secure.[41]   Relying on these allegations and contentions, Plaintiff ultimately argues the Commissioners failed to provide adequate funding for the Brown County Jail as demonstrated by the fact that on the day Belden committed suicide, the sole corrections officer at the Brown County Jail was by himself and thus unable to take appropriate action in removing the paper barrier from Belden's cell window for approximately two hours.

The Court is not persuaded by Plaintiff's argument.  As a preliminary matter, Plaintiff's reliance on K.S.A. 19-1919 to impose section 1983 liability on the County Commissioners is misplaced.  This Kansas statute is simply the funding mechanism for the state's county jails.  There is no evidence to demonstrate that the responsibility for funding includes any authority for the running of jails or that the County Commissioners have any connection with the operation of the jail other than with respect to funding.  Simply put, Plaintiff identifies no evidence connecting the Brown County Commissioners with Belden's suicide or with any policy bearing on his suicide.  Because Plaintiff fails to identify a legal or factual basis for imposing section 1983 liability on the Brown County Commissioners, the Court will enter summary judgment in favor of these Defendants in their official capacity on Plaintiff's section 1983 claims.[42]

---

[41]*See* Plaintiff's Brief in Opposition to Summary Judgment at pp. 33-34 (doc. 34) (citing K.S.A. 19-1919, which provides in relevant part that "[t]here shall be established and kept at every county seat, by authority of the board of county commissioners, at the expense of the county, a jail for the safekeeping of prisoners lawfully committed.").

[42]*Accord, Lee v. Wyandotte County, Kansas*, 586 F.Supp. 236, 238-39 (D. Kan. 1984) (where County Commissioners sued by jail inmates after inmates shot by sheriff's deputy, court granted Commissioner's Motion for Summary Judgment because "[t]he Board of County Commissioners has no authority to supervise, discipline, or remove the sheriff or his subordinates . . . [and] the conduct of the sheriff and his subordinates cannot be attributed to the county commissioners.").

### b.      Sheriff Shoemaker

"[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."[43]  "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."[44]  Applying this principle to the case at hand, the Court finds the suit against Shoemaker in his official capacity as Brown County Sheriff must be construed to be a suit against the governing body of Brown County:  the Brown County Commissioners.  Because the Court already has determined that there is no legal or factual basis for imposing section 1983 liability on the Brown County Commissioners, the Court similarly will enter judgment on Plaintiff's section 1983 claim in favor of Defendant Shoemaker in his official capacity as Sheriff of Brown County.[45]

### B.      State Law Claims

Defendants argue they are entitled to summary judgment on Plaintiff's state law negligence claims pursuant to exceptions set forth within the Kansas Tort Claims Act ("KTCA").[46]  The KTCA, which makes governmental liability the rule and immunity the exception,[47] provides that each governmental entity shall be liable for the negligent or wrongful acts or omissions of its employees acting within the scope of their employment under the same circumstances that a private person

---

[43]*Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978).

[44]*Kentucky v. Graham*, 473 U.S 159, 166 (1985) (citation omitted).

[45]*See Smith v. Bd. of County Comm'rs*, 216 F. Supp 2d 1209, 1219-20 (D. Kan. 2002) (dismissing a section 1983 claim against a sheriff in his official capacity when the Board of County Commissioners was also a party).

[46]K.S.A. 75-6103(a).

[47]*Dougan v. Rossville Drainage Dist.*, 243 Kan. 315, 318, 757 P.2d 272 (1988).

would be liable.[48]  The governmental entity bears the burden to establish immunity under any one of the exceptions set forth in K.S.A. 75-6104.[49]

### 1.      Immunity Due to Performance of a Discretionary Function

In *Robertson v. City of Topeka*,[50] the Kansas Supreme Court determined that in deciding whether the discretionary function exception applies, it is the nature and quality of the discretion exercised which should be the focus rather than the status of the employee exercising the discretion. The test is whether the judgment of the governmental employee is of the nature and quality which the legislature intended to put beyond judicial review.

"The more a judgment involves the making of policy the more it is of a 'nature and quality' to be recognized as inappropriate for judicial review."[51] The discretionary function exception is applicable only when no clearly defined mandatory duty or guideline exists which the government agency is required to follow.[52]

Notably, the discretionary function exception to the KTCA is not applicable in those situations where a legal duty exists – pursuant either to case law or to statute – which a governmental

---

[48]K.S.A. 75-6104; *see, also, Collins v. Board of Douglas County Comm'rs.*, 249 Kan. 712, 720, 822 P.2d 1042 (1991).

[49]*Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 364, 819 P.2d 587 (1991).

[50]231 Kan. 358, 361-62, 644 P.2d 458 (1982).

[51]*Kansas State Bank & Tr. Co.*, 249 Kan. at 365, 819 P.2d 587.

[52]*Collins*, 249 Kan. at 721, 822 P.2d 1042; *Dougan*, 243 Kan. at 322, 757 P.2d 272.

agency is required to follow.  The governmental agency cannot properly claim that its challenged action falls within the discretionary function exception where the action taken violated a legal duty.[53]

To that end, and relevant to whether the jailer/prisoner relationship gives rise to a duty to aid or protect, section  314A(4) of the Restatement (Second) of Torts provides that "[o]ne who is required by law to take – or who voluntarily takes – the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other." The comments to the Restatement specifically explain that the duty to protect the other against unreasonable risk and harm extends to risk arising out of the actor's own conduct.[54]

Because there is evidence that Defendants owed an independent legal duty to Belden,  the KTCA discretionary function exception is not applicable here.

### 2.    Immunity Based on the KTCA Police Protection Exception

The exception under the Kansas Tort Claims Act relating to police and fire protection is likewise claimed as a defense by Defendants in this case.  This exception is not applicable to the situation here for several reasons.  First, Defendants had a legally recognized and independent duty to Belden.  The legal obligation of the correction facility employees to protect inmates has been clearly stated above.

Moreover, there is no evidence that the KTCA police protection exception is applicable to correctional facility officers; instead, the exception is generally limited to those law enforcement officers that are dealing with the general public in enforcing laws of various jurisdictions.[55]

---

[53]*Nero v. Kansas State Univ.*, 253 Kan. 567, 587, 861 P.2d 768, 782 (1993).

[54]Restatement (Second) of Torts § 314A(4), cmt. d.

[55]*Washington v. State,* 17 Kan.App.2d 518, 525-26, 839 P.2d 555 (Kan. App. 1992).

In sum, Defendants are not entitled to immunity from liability under the KTCA. Accordingly, Defendants' motion for summary judgment on Plaintiff's negligence claims are denied.

## IV.   Conclusion

Based on the discussion above, Defendants' Motion (doc. 30) is granted in part and denied in part.  The Motion is granted with respect to Plaintiff's constitutional claims against Defendants Ploeger, Leitch and Steve Roberts.  Defendants' Motion is denied, however, with respect to Plaintiff's constitutional claims against Defendants Shoemaker, Hollister and Brandon Roberts, as well as Plaintiff's negligence and wrongful death claims against all Defendants.

IT IS SO ORDERED.

Dated in Kansas City, Kansas on this 17th day of November, 2005.


s/ David J. Waxse
David J. Waxse
United States Magistrate Judge

cc:    All counsel and *pro se* parties

25