**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

MARIE GASTON,

           Plaintiff,

v.                                  Case No.  04-2368-DJW

WARREN PLOEGER, et al.,

           Defendants.

## <u>MEMORANDUM AND ORDER</u>

Jeffrey Ray Belden ("Belden") committed suicide on August 14, 2002 while he was incarcerated as a pretrial detainee in Brown County, Kansas.  Thereafter, Belden's mother brought this lawsuit on Belden's behalf asserting (1) a 42 U.S.C. § 1983 claim that various Brown County officials were deliberately indifferent to the risk that Belden would commit suicide; and (2) state law negligence and wrongful death claims.  Defendants moved for summary judgment on the basis of qualified immunity with respect to the section 1983 claims and on the basis of immunity with regard to the state law claims.  This Court granted the motion with respect to the section 1983 claims against County Commissioners Warren Ploeger, Glen Leitch, and Steve Roberts, but denied the motion with respect to the section 1983 claims against Sheriff Lamar Shoemaker, Sergeant Brett Hollister, and Officer Brandon Roberts.  The Court also denied summary judgment as to all Defendants on Plaintiff's state law negligence and wrongful death claims.

Sheriff Lamar Shoemaker and Sergeant Brett Hollister appealed the Court's decision to deny qualified immunity to Shoemaker and Hollister under section 1983.  The Tenth Circuit ultimately remanded the case with a mandate to enter summary judgment in favor of Hollister and Shoemaker on Plaintiff's federal constitutional claims.  As a result, Plaintiff's remaining claims in this case are

her section 1983 claim against Officer Roberts and her state law negligence claims against all Defendants.

Currently pending before the Court are the following motions:

- Motion to Dismiss (doc. 61) all claims filed by Officer Roberts on grounds that Plaintiff failed to serve him with the Complaint in this case (thereby depriving the Court of personal jurisdiction over him) and on grounds that Plaintiff's claims against him are barred by the applicable statute of limitations;

- Motion for Summary Judgment (doc. 63) as to Plaintiff's section 1983 claim filed by Officer Roberts on grounds of qualified immunity;

- Motion for Summary Judgment (doc. 63) as to Plaintiff's Kansas state law claims filed by Commissioners Ploeger, Leitch, and Steve Roberts; Sergeant Hollister; and Sheriff Shoemaker on grounds of immunity; and

- Motion to Decline Supplemental Jurisdiction (doc. 65) filed by Defendants Brandon Roberts, Warren Ploeger, Glen Leitch, Steve Roberts, Lamar Shoemaker and Brett Hollister.

## Discussion

**A.     Motion to Dismiss**

### 1.     Relevant Procedural Background Related to Motion to Dismiss

This case was filed on August 6, 2004 by Plaintiff against County Commissioners Warren Ploeger, Glen Leitch, and Steve Roberts, Sheriff Lamar Shoemaker, Sergeant Brett Hollister and various John Doe(s) and Jane Doe(s), who were described in the Complaint as "unidentified employees of Brown County, Kansas and the Brown County Jail who were responsible for guarding and supervising Jeffrey Ray Belden on the day of his death." On August 27, 2004, attorney Michael Baker entered an appearance on behalf of all named Defendants. On November 3, 2004, a Scheduling Order was entered.

Discovery closed on May 18, 2005 and the final pretrial conference was held on May 25, 2005. The Pretrial Order was jointly prepared by Michael Baker, attorney for Defendants, and Robert Laing, attorney for Plaintiff. Both prior to and at the pretrial conference, the parties jointly agreed to substitute Officer Brandon Roberts as a named Defendant for "John Doe" in Plaintiff's Complaint. The Pretrial Order was entered on June 13, 2005 and, as set forth below, reflects the parties agreement to substitute Brandon Roberts:

**12.    AMENDMENTS TO PLEADINGS.**
**The parties agree to substitution of Brandon Roberts as a named Defendant for "John Doe" in Plaintiff's Complaint. The court accepts this agreement and hereby orders the substitution of Brandon Roberts as a named Defendant.**

In light of this amendment to the Complaint, Defendants repeatedly acknowledge Brandon Roberts as a named Defendant in the Pretrial Order:

- In paragraph 4 (Stipulations) of the Pretrial Order, the parties stipulate that "none of the Defendants, except Brandon Roberts, were at the Brown County Jail on the evening of August 14, 2002."

- In paragraph 5(b) (Defendant's Factual Contentions) of the Pretrial Order, Defendants acknowledge that "Plaintiffs [sic] seek to impose liability on . . . Brandon Roberts as a corrections officer with the Brown County Jail." Defendants go on to state that "on the evening of August 14, 2002 none of the Defendants, except Brandon Roberts, was present at the Brown County Jail."

- In paragraph 7(a) ("Defendant's Defenses") of the Pretrial Order, Defendants assert that "None of the Defendants, except Brandon Roberts, personally participated in any of the activities regarding Jeffrey Ray Belden on August 14, 2002" and that "Brandon Roberts could not have been reasonably aware that [he was] violating any of Jeffrey Ray Belden's Constitutional rights on August 14, 2002."

In paragraph 7(b) ("Essential Elements of Defendant's Affirmative Defenses") of the Pretrial Order, Defendants list the defense of qualified immunity. The only other affirmative defense listed

3

is that the county commissioners are not proper parties to the action. There is no affirmative defense relating to Defendant Brandon Roberts other than qualified immunity.

Paragraph 9 ("Legal Issues") of the Pretrial Order sets forth the following legal issues to be resolved by the Court: (a) whether any of the defendants are entitled to qualified immunity, (b) whether both the objective and subjective components of "deliberate indifference" have been met; (c) whether the Brown County commissioners are proper parties to the action; and (d) Defendants' immunity on the state law claims pursuant to the Kansas Tort Claims Act.

On May 26, 2006 (one day after the pretrial conference was held), Plaintiff issued a Notice to Take Deposition Duces Tecum of Brandon Roberts on June 8, 2005. Plaintiff served this notice upon Michael Baker, as attorney for Brandon Roberts. The deposition went forward as scheduled on June 8, 2005 at the law offices of Shook, Hardy & Bacon, LLP – Mr. Baker's law firm.

On June 28, 2005, Defendants, by and through attorney Michael Baker of the law firm Shook, Hardy & Bacon, LLP, filed a Motion for Summary Judgment on behalf of all Defendants, including Brandon Roberts (doc. 30).[1] Upon consideration of the facts and arguments presented in the briefing, the Court ultimately granted Defendants' Motion for Summary Judgment with respect to Plaintiff's constitutional claims against Defendants Ploeger, Leitch, and Steve Roberts and denied Defendants' Motion for Summary Judgment with respect to Plaintiff's constitutional claims against Defendant Shoemaker, Hollister, and Brandon Roberts, as well as Plaintiff's negligence and wrongful death claims against all Defendants.

---

[1]Defs' Mem. in Supp. of Summ. J. (doc. 31) at Section III(c) ("The § 1983 claims against defendants Shoemaker, Hollister and [Brandon] Roberts as individuals must be analyzed under the legal standards applicable to deliberate indifference and qualified immunity."; "Deliberate indifference requires that Defendants Shoemaker, Hollister and Roberts were aware of and disregarded a substantial risk that Belden would commit suicide.")

4

Defendants appealed the decision denying qualified immunity.  On May 9, 2007, the Tenth Circuit remanded the case with a mandate to enter summary judgment (on qualified immunity grounds) in favor of Hollister and Shoemaker on Plaintiff's federal constitutional claims.  In its opinion, however, the Tenth Circuit explicitly declined to consider whether Brandon Roberts was entitled to qualified immunity, because Brandon Roberts did not properly appeal the denial of the summary judgment motion.  The section of the Tenth Circuit opinion addressing this issue is set forth below:

II.  Officer Roberts's Attempted Appeal

Having held that we have jurisdiction over the appeal, we must now determine whether Officer Brandon Roberts is rightly before us.  The notice of appeal, timely filed on December 1, 2005, reads as follows:

> Notice is hereby given that Defendants Warren Ploeger, Glen Leitch, Steve Roberts, County Commissioners of Brown County, Kansas, Lamar Shoemaker and Brett Hollister ("Defendants"), in the above-referenced matter, hereby appeal to the United States Court of Appeals for the Tenth Circuit from a Memorandum and Order denying Defendants' claims for qualified immunity entered in this action on the 17th day of November, 2005.

Officer Brandon Roberts's name does not appear at all in the text or the caption of the notice of appeal.  *See id.*

Pursuant to Fed. R. App. P. 3(c)(1)(A), a notice of appeal must "specify the party or parties taking the appeal by naming each one in the caption or body of the notice...." In *Torres v. Oakland Scavenger Co.*, the Supreme Court held that "[t]he failure to name a party in the notice of appeal is more than excusable 'informality'; it constitutes a failure of that party to appeal." 487 U.S. 312, 314 (1988). Following *Torres*, the Federal Rules of Appellate Procedure were amended to make clear that "[a]n appeal must not be dismissed for informality of form or title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise clear from the notice." Fed. R. App. P. 3(c)(4). Moreover, the amended Rule permits "an attorney representing more than one party [to] describe those parties with such terms as 'all plaintiffs,' 'the defendants,' 'the plaintiffs A, B, et al.,' or 'all defendants except X.'" *Id.*

5

In light of these changes, the dispositive question is whether the notice of appeal has provided fair notice of the parties that intend to appeal the lower court's decision. *See Dodger's Bar & Grill, Inc. v. Johnson County Bd. of County Comm'rs*, 32 F.3d 1436, 1440-41 (10th Cir.1994). We have held that the jurisdictional nature of Rule 3(c) prevents us from considering an appeal by a party whose intent to appeal is not clear from the notice even when the omission of the party is inadvertent and the opposing party has suffered no prejudice. *See Twenty Mile Joint Venture, PND, Ltd. v. Comm'r of Internal Revenue*, 200 F.3d 1268, 1274 (10th Cir.1999). Accordingly, we have concluded that the omission of one party where others are mentioned by name is insufficient to indicate that the omitted party intended to appeal. *See id.* at 1273-74.

Here, both the caption and the body of the notice listed five of the original six defendants by name. Nothing in the notice even suggested that Officer Roberts intended to appeal the denial of summary judgment. In these circumstances, we have little difficulty concluding that the notice of appeal did not provide fair notice that Officer Roberts intended to appeal. Therefore, we lack jurisdiction to consider whether Officer Roberts was entitled to summary judgment.[2]

In a footnote, the Tenth Circuit specifically noted that "[o]f course, Officer Roberts may again assert qualified immunity later in the proceedings. Nothing we say here is meant to indicate any opinion about whether Officer Roberts is entitled to qualified immunity."[3]

On April 27, 2007, the Court held a telephone status conference with the parties, within which the Court set the case for a pretrial conference on May 16, 2007 and ordered counsel to jointly submit a proposed supplemental Pretrial Order prior to the conference. In this supplemental submission, Defendants presented a key change to the original Pretrial Order already in place, indicating for the first time that "[t]he court's personal jurisdiction over Brandon Roberts is disputed."[4] On May 31, 2007, the Court entered the Pretrial Order as submitted by the parties.

---

[2]*Gaston v. Ploeger*, 229 Fed. Appx. 702, 708-09, 2007 WL 1087281, *5-6 (10th Cir. April 12, 2007).

[3]*Id.* at 709, 2007 WL 1087281 at *6 (citing *Langley v. Adams County*, 987 F.2d 1473, 1481 n.3 (10th Cir. 1993) (internal citation omitted)).

[4]May 31, 2007 Pretrial Order at ¶3(b) (doc. 57).

6

On July 17, 2007, Defendants filed an Unopposed Motion to Amend the May 31, 2007 Pretrial Order.  In support of this request, Defendants stated that

> [t]hrough inadvertence, the defense and affirmative defense of lack of personal jurisdiction over Brandon Roberts and concomitant statute of limitations was not set forth at paragraphs 7.a. and b. [of the May 31, 2007 Pretrial Order].  The inclusion of the aforementioned affirmative defenses should be enumerated in the Pretrial Order so that the Order will properly reflect the grounds upon which Brandon Roberts will be filing his dispositive motion."[5]

The Court granted Defendants' unopposed request and the Amended Pretrial Order reflecting these new defenses was entered by the Court on July 25, 2007.[6]  Within days of this filing, Officer Roberts filed the Motion to Dismiss currently pending.  More specifically, Officer Roberts requests that the Court dismiss all claims against him for Plaintiff's failure to serve him with the Complaint in this case, thereby depriving the Court of personal jurisdiction over him, and because Plaintiff's claims are barred by the applicable statute of limitations.  The Court disagrees.

### 2.    Analysis

#### a.    Personal Jurisdiction

Defendant Brandon Roberts argues that Plaintiff's failure to serve him with the Complaint in this case deprives the Court of personal jurisdiction.  Without reaching the merits of this argument, the Court finds Brandon Roberts previously waived the defense of lack of personal jurisdiction, and thus the Court will deny the instant motion on procedural grounds.

---

[5]Defs' Motion to Amend Pretrial Order (doc. 58).

[6]Doc. 60.

"A defect in the district court's jurisdiction over a party is a personal defense which may be asserted or waived by a party."[7]  Objections to personal jurisdiction or insufficiency of service must be asserted in the Defendant's answer or in a pre-answer motion.[8]  If a party files a pre-answer motion and fails to assert the defenses of lack of personal jurisdiction or insufficiency of service, he waives these defenses.[9]

The Court finds that Defendant Brandon Roberts' Motion for Summary Judgment – filed on behalf of Brandon Roberts[10] by his attorney fifteen days after entry of the Pretrial Order substituting him as a Defendant – qualifies as a pre-answer motion pursuant to Fed. R. Civ. P. 12(b).  Although Brandon Roberts raised various defenses therein, he failed to raise the defense of lack of personal jurisdiction or insufficiency of process anywhere in the motion or in the memorandum in support of the motion.  By seeking affirmative relief from the Court in the form of a motion for summary judgment that fails to raise the defense of lack of personal jurisdiction or insufficiency of process,

---

[7]*ORI, Inc. v. Lanewala*, 147 F. Supp. 2d 1069, 1074 (D. Kan. 2001) (citing *Fed. Deposit Ins. Corp. v. Oaklawn Apts.*, 959 F.2d 170, 174-75 (10th Cir. 1992) (quoting *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1202 (10th Cir. 1986))).

[8]*See id.* (citing Fed. R. Civ. P. 12(b)).

[9]*See id* (citing Fed. R. Civ. P. 12(h)(1)).

[10]Again, the argument in Defendants' Memorandum (doc. 31 at Section III(C)) makes clear that the motion was filed on behalf of all Defendants, including Defendant Brandon Roberts ("The § 1983 claims against defendants Shoemaker, Hollister and [Brandon] Roberts as individuals must be analyzed under the legal standards applicable to deliberate indifference and qualified immunity."; "Deliberate indifference requires that Defendants Shoemaker, Hollister and [Roberts] were aware of and disregarded a substantial risk that Belden would commit suicide.")

Defendant Brandon Roberts has procedurally waived his right to assert such a defense.[11] Accordingly, the Court deems the defense waived and denies Brandon Roberts' Motion to Dismiss for lack of personal jurisdiction.[12]

### b.    Effectuation of Sufficient Service of Process

Even if Brandon Roberts had not procedurally waived his right to object to the Court's personal jurisdiction over him, the Court would overrule such an objection on grounds that the facts demonstrate that Plaintiff sufficiently effectuated service of process upon Brandon Roberts. Rule 4 of the Federal Rules of Civil Procedure governs the procedure in federal district court for issuing summons and service of process. Rule 4(e) provides that, unless federal law provides otherwise, an individual may be served in a judicial district of the United States by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made."[13] To that end, Kan. Stat. Ann. 60-203(c) provides that "[t]he

---

[11]*ORI, Inc.*, 147 F. Supp. 2d at 1074 (citing *Hunger United States Special Hydraulics Cylinders Corp. v. Hardie-Tynes Mfr. Co.*, No. 99-4042, 2000 WL 147392 (10th Cir. Feb.4, 2000) (defendant "actively participated in the litigation and sought affirmative relief from the court" by filing cross-claims, thereby waiving personal jurisdiction defense).

[12]Brandon Roberts did eventually raise the issue of the Court's jurisdiction in the Amended Pretrial Order, which was entered after the case was remanded from the Tenth Circuit. This fact, however, fails to revitalize a personal jurisdiction defense that already has been waived. While a pretrial order typically supercedes past pleadings, the waiver of the defense of lack of personal jurisdiction (unlike, for example, the waiver of the defense of res judicata) is absolute. *See ORI, Inc.,* 147 F. Supp. 2d at 1074 (citing *Ramada Franchise Sys., Inc. v. Tresprop, Ltd.*, 75 F. Supp. 2d 1205, 1214 (D. Kan. 1999) (stating that the only defenses that are irrevocably waived are those involving the core issue of a party's willingness to submit a dispute to judicial resolution, such as personal jurisdiction); Wright & Miller, Fed. Practice and Procedure: Civil 2d § 1391 (if the defense of lack of personal jurisdiction is not raised in the defendant's initial motion it is "permanently lost") (emphasis added).

[13]Fed. R. Civ. P. 4(e).

filing of an entry of appearance shall have the same effect as service."[14]   A formal entry of appearance is not required, as District of Kansas local rule provides that counsel may make an entry of appearance by "signing the initial pleading, motion or notice of removal filed in the case."[15]

Here, the first pleading filed by counsel on behalf of Defendant Brandon Roberts after he was substituted for the John Doe defendant was Defendants' June 28, 2005 Motion for Summary Judgment (doc. 30).   The substance of the arguments presented by counsel in Defendants' Memorandum in Support of Summary Judgment make clear that counsel was moving for summary judgment on Brandon Roberts' behalf and that counsel was legally representing Roberts in this endeavor.[16]   For these reasons, the Court finds counsel entered an appearance on behalf of Brandon Roberts by signing the Motion for Summary Judgment on June 28, 2005.   Because the filing of an entry of appearance has the same effect as service, the Court deems service upon Brandon Roberts was properly effectuated on June 28, 2005, bringing Brandon Roberts within the personal jurisdiction of the district court.

### c.    Statute of Limitations

Belden committed suicide on August 14, 2002 and this lawsuit was filed on August 6, 2004. There is no dispute between the parties that the original Complaint was timely filed within the

---

[14]*Jenkins v. City of Topeka*, 136 F.3d 1274, 1276 (10th Cir. 1998) (citing *Lindenman v. Umscheid*, 255 Kan. 610, 875 P.2d 964, 978 (1994)).

[15]D. Kan. Rule 5.1(d).

[16]Defs' Mem. in Supp. of Summ. J. (doc. 31) at Section III(C) ("The § 1983 claims against defendants Shoemaker, Hollister and [Brandon] Roberts as individuals must be analyzed under the legal standards applicable to deliberate indifference and qualified immunity."; "Deliberate indifference requires that Defendants Shoemaker, Hollister and Roberts were aware of and disregarded a substantial risk that Belden would commit suicide.")

applicable two-year statute of limitations. The Complaint, however, names John Doe, not Brandon Roberts, as the defendant who was responsible for guarding and supervising Belden on the day of his death. Defendants argue that because the parties did not stipulate to substitution of Brandon Roberts for the John Doe defendant until the June 13, 2005 Pretrial Order was entered – which was almost a year after the two-year statute of limitations expired – Plaintiff's claims against Brandon Roberts are barred by the statute of limitations. The Court disagrees on grounds that, under the facts here, Brandon Roberts has waived his right to assert a statute of limitations defense.

A statute of limitations defense is an affirmative defense that must be timely asserted or it is waived.[17] A statute of limitations defense is generally waived if not set forth in a defendant's responsive pleading.[18] With that said, a statute of limitations defense may be preserved if it is set forth in the pretrial order.[19]

In the present case, Brandon Roberts failed to assert his statute of limitations defense in the Pretrial Order adding him as a party-defendant without objection. Neither was the statute of limitations defense raised in Defendant Brandon Roberts' Motion for Summary Judgment, which was filed on behalf of Brandon Roberts[20] by his attorney fifteen days after entry of the Pretrial Order

---

[17]*See* Fed. R. Civ. P. 8(c) (party "shall" set forth affirmative defenses).

[18]*See Expertise Inc. v. Aetna Fin. Co.*, 810 F.2d 968, 973 (10th Cir. 1987).

[19]*Id.*

[20]Again, the argument in Defs' Mem. (doc. 31 at Section III(C)) makes clear that the motion was filed on behalf of all Defendants, including Defendant Brandon Roberts ("The § 1983 claims against defendants Shoemaker, Hollister and [Brandon] Roberts as individuals must be analyzed under the legal standards applicable to deliberate indifference and qualified immunity." "Deliberate indifference requires that Defendants Shoemaker, Hollister and Roberts were aware of and disregarded a substantial risk that Belden would commit suicide.")

11

substituting him as a party-defendant.  By failing to include a statute of limitations defense in the Pretrial Order adding him as a party-defendant and by seeking affirmative relief from the Court in the form of a motion for summary judgment that fails to raise a statute of limitation defense, the Court finds Defendant Brandon Roberts has procedurally waived his right to assert such a defense.[21] Accordingly, the court finds Defendant Brandon Roberts has waived any defense based on expiration of the applicable limitations period.

**B.     Motion for Summary Judgment**

As set forth above, Plaintiff's remaining claims in this case are her section 1983 claim against Officer Roberts and her state law negligence claims against all Defendants.  In the pending motion, Defendants seek summary judgment on the basis of qualified immunity with respect to the section 1983 claims against Brandon Roberts and on the basis of immunity with regard to the state law claims against all Defendants, except Brandon Roberts.

**1.     Undisputed Facts**

The following facts are taken from the summary judgment record and are either uncontroverted or viewed in the light most favorable to Plaintiff's case.  Immaterial facts and facts not properly supported by the record are omitted.

1.     Defendants Warren Ploeger, Glen Leitch and Steve Roberts are County Commissioners of Brown County, Kansas.

2.     The Brown County, Kansas Board of County Commissioners are duly elected and a governing entity of Brown County, Kansas.

3.     Defendant Lamar Shoemaker is employed as the Sheriff of Brown County, Kansas.

---

[21]*ORI, Inc.*, 147 F. Supp. 2d at 1074 (citing *Hunger*, No. 99-4042, 2000 WL 147392 (10th Cir. Feb. 4, 2000) (defendant "actively participated in the litigation and sought affirmative relief from the court" by filing cross-claims, thereby waiving personal jurisdiction defense).

4.    Sheriff Shoemaker has the ultimate responsibility for how the jail is run.

5.    Defendant Sergeant Brett Hollister is employed as the jail administrator within the Brown County, Kansas Sheriff's Department.

6.    During the relevant time period, Defendant Brandon Roberts was employed as a jailer within the Brown County, Kansas Sheriff's Department.

7.    On June 26, 2002, Belden was incarcerated in the Brown County Jail for possession of methamphetamine with intent to sell.

8.    On August 14, 2002, Belden received a letter from his then fiancé.

9.    Sometime during the afternoon on August 14, 2002, Belden plugged the toilet in his cell and flooded the cell floor.  As a result of the flooded floor, Belden was moved by Sergeant Hollister to Cell Four, another single person cell.

10.   Prior to August 14, 2002, Mr. Belden had not been a disciplinary problem at the jail.

11.   Officer Roberts came on duty at 4:00 p.m.

12.   Officer Roberts first observed Mr. Belden at about 4:15 p.m., at which time Mr. Belden was in his cell writing a letter or sitting at the table.  Mr. Belden did not seem angry and he did not make any comments.

13.   Officer Roberts then set up for dinner and ordered the meals at 4:30 p.m.  Officer Roberts completed his hourly "jail check" or "body check" (a physical observation of each of the inmates) at 4:45 p.m., and all inmates were secure.

14.   At 5:25 p.m., Officer Roberts served dinner to the inmates.  At 5:32 p.m., Mr. Belden came out of his cell to get his dinner and threw his tea in the hallway.  Mr. Belden told Officer Roberts to come "clean that fucking mess up."  Officer Roberts asked Mr. Belden what his issue was, and Mr. Belden said that he did not understand why he had been put in Cell Four and that he wanted to be moved.  Officer Roberts told Mr. Belden that Sergeant Hollister would handle it the next day and that he should go back into his cell.  Mr. Belden said he was not going to go back, and told Officer Roberts to come make him, threatening to "get him" if he came back alone to the cell area.

15.   At about 5:30 p.m., Officer Roberts contacted Doug Brammer, a Brown County sheriff's department road patrol deputy officer, to help put Mr. Belden back in Cell Four.  Deputy Brammer was upstairs in the dispatch area getting ready to go out onto the road.  Deputy Brammer had mace in his hand, and Mr. Belden went back into his cell without any problem.

13

16.     Sometime between 5:30 p.m. and 6:00 p.m, Belden placed paper over his cell window.

17.     Officer Roberts' next jail check was at 6:40 p.m., at which time Officer Roberts noticed that Belden had placed paper over his cell window.  Officer Roberts instructed Belden to remove the paper from his cell window but Belden refused and threatened Officer Roberts if Roberts came into the cell.

18.     Officer Roberts finished his jail check and called Sergeant Hollister sometime between 6:30 p.m. and 6:45 p.m.  Officer Roberts told Sergeant Hollister about the tea incident and that Mr. Belden had covered his windows and refused to remove the covering.  Sergeant Hollister told Officer Roberts to remove the paper and move Mr. Belden to Cell Fourteen, but not until he had a second officer with him.

19.     Cell Fourteen was a cell outside of the general population jail area, where the officer could observe an inmate on suicide watch every fifteen minutes.  Cell fourteen was also used to house people who were too intoxicated to be processed, people prior to bonding, people with medical problems, and inmates who needed to be observed for other reasons.[22]

20.     Officer Roberts was aware that Cell Fourteen was used to house inmates on suicide watch.

21.     Inmates in Cell Fourteen were to be observed every fifteen minutes.

22.     Other than Cell Fourteen, jail procedures require that inmates be observed every one hour.

23.     There is a dispatcher in the jail building who handles 911 calls and other calls to the sheriff's office.  The dispatcher could call in a Brown County road officer, but it could take an hour and thirty minutes to get someone to the jail, depending on how many deputies were working and where the deputies were in the county.

24.     Officer Roberts testified that after calling Sergeant Hollister, he notified dispatch to call for another officer to come to the jail to assist with Belden.

_____

[22]Plaintiff does not present any material dispute of fact in response to Defendants' statement of uncontroverted fact. Rather, Plaintiff purports to controvert facts on the basis that they are "self-serving" or a matter of opinion. This is not, in and of itself, a valid basis for disputing a properly supported statement of fact. These allegedly "self-serving" statements were made under oath, based on personal knowledge, and are supported by citations to the record. Plaintiff offers no citation to any evidence to controvert these statements. See D. Kan. R. 56.1(b) (requiring nonmovant to "refer with particularity to those portions of the record upon which the opposing party relies" for each fact in dispute). Plaintiff, therefore, has not established a factual dispute, and this statement of fact remains uncontroverted.

25.     The jail log prepared by Officer Roberts on the day of Belden's suicide

- does not include any reference to Roberts contacting dispatch and requesting a road deputy to come in and assist him in removing the paper from Belden's cell door window; and

- does include a statement from Roberts indicating that he was waiting for Deputy Brammer to come back to the jail from his dinner break and assist him in removing the paper from Belden's cell door window.

26.     Former Deputy Doug Brammer, who was on duty during the relevant time period, states he was never notified by dispatch or anyone else that Officer Roberts had requested assistance.

27.     Sergeant Hollister states that if, in fact, Officer Roberts did request the dispatcher call for a second officer to come in, that request should have been indicated on Roberts' log.

28.     At 6:45 p.m., Officer Roberts offered all the male inmates "rec," which is the one hour per day when they may leave their cells and go to the recreation room. As the inmates went to the rec room, Officer Roberts followed them on cameras to make sure they got there. Officer Roberts unlocked and locked the rec room door remotely.

29.     At 7:00 p.m., Officer Roberts wrote a report regarding the incident with Mr. Belden. At 7:12 p.m., an inmate had visitation with his family. When family came to visit, the officer checked the family's identification, made sure there was an appointment, and had the family sign the visitation log. After the visit, the officer released the inmate back to his cell.

30.     At 7:38 p.m., Officer Roberts completed a jail check; all inmates were secure. At about 7:45 p.m., Officer Roberts did another jail check and looked in on the inmates in rec. Mr. Belden still had paper over his cell window. Officer Roberts yelled at him and told him to take the paper off. Mr. Belden said, "fuck off." Officer Roberts was waiting until Deputy Brammer came back from dinner break to open the door to Mr. Belden's cell and remove the paper. In the meantime, Officer Roberts was taking inmates to and from rec and doing different things, so he passed by Mr. Belden's cell door a lot. Officer Roberts talked to Mr. Belden at least three or four times after he covered his window.[23]

_____

[23]Plaintiff does not present any material dispute of fact in response to Defendants' statement of uncontroverted fact. Rather, Plaintiff purports to controvert facts on the basis that they are "self-serving" or a matter of opinion. These statements, however, were made under oath, based on personal knowledge, and are supported by citations to the record. Plaintiff offers no citation to any evidence to controvert these statements. See D. Kan. R. 56.1(b) (requiring nonmovant to "refer with particularity to those portions of the record upon which the opposing party relies" for each fact in dispute). Plaintiff, therefore, has not established a factual dispute, and this statement of fact remains uncontroverted.

31.     After rec, Officer Roberts had to go through the procedures for moving inmates from the rec room back to their cells and making sure that all inmates got back to their cells.  At 7:50 p.m., Officer Roberts secured the inmates from rec.  By 8:00 p.m., Officer Roberts had all of the other inmates in their cells and was finished with running rec and visitation.

32.     At about 8:15 p.m., Officer Roberts let inmate Anthony Lawson out to do laundry.  Roberts decided to have Lawson, an inmate trustee, accompany him to Mr. Belden's cell.  Officer Roberts just wanted to get the paper off the window and tell Mr. Belden to chill out.  Roberts felt that Mr. Lawson would not let Mr. Belden hurt him and that Mr. Belden would listen to Mr. Lawson because they knew each other.  Officer Roberts did not have Mr. Lawson help earlier because other inmates were out of their cells, which would cause control problems if Mr. Belden misbehaved.[24]

33.     When Officer Roberts pushed the button to open the door to Mr. Belden's cell, it would not open.  Mr. Lawson said that he could see Mr. Belden hanging in the cell.

34.     Officer Roberts told dispatch to call EMS, then he went into Mr. Belden's cell.  At about 8:18 p.m., Deputy Brammer, who had returned to the sheriff's office, heard the dispatcher call the ambulance, so he went to help.  They got the door open and began CPR.

35.     After the suicide, Mr. Belden's former cellmates informed jail staff that he had spoken of suicide on several occasions.  In the days leading up to his death, Mr. Belden had given away his food, rocked back and forth on his bed for extended periods of time, and tied his shoelaces together to see whether they would support his body weight.  Apparently, Mr. Belden's fellow inmates believed that this behavior was simply an effort to get attention.  In any case, it is undisputed that they did not report their observations to anyone in the jail before Mr. Belden committed suicide.

## 2.      Standard for Summary Judgment

Summary judgment is appropriate if the moving party demonstrates there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[25]  The Court must view the evidence and all reasonable inferences that may be drawn from that evidence in the light

---

[24]*See id.*

[25]Fed. R. Civ. P. 56(c).

most favorable to the nonmoving party.[26]  A fact is material if, under the applicable substantive law, it is essential to the proper disposition of the claim.[27]  An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. [28]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law.[29]  In meeting that standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the other party's claim, but must simply point out to the court that the other party lacks evidence on an essential element of its claim.[30]  Once the movant has met this initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[31]  The nonmoving party may not simply rest upon its allegations to satisfy its burden.[32]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[33]  "To accomplish this, the

---

[26]*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

[27]*Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

[28]*Id.*

[29]*Id.* at 670-71 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

[30]*Id.* at 671 (citing *Celotex*, 477 U.S. at 325, 106 S. Ct. 2548).

[31]*Anderson*, 477 U.S. at 256, 106 S. Ct. 2505; *accord Adler*, 144 F.3d at 671.

[32]*Id.*; *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

[33]*Adler*, 144 F.3d at 671 (internal quotation omitted).

facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[34]

Finally, it must be noted that summary judgment is no longer regarded as a disfavored procedural shortcut.  Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[35]

### 3.    Summary Judgment on Grounds of Qualified Immunity as to Brandon Roberts

### a.    Legal Standard for Qualified Immunity

The following legal standard regarding qualified immunity recently was set forth by the Tenth Circuit Court of Appeals:

> Although "neither prison officials nor municipalities can absolutely guarantee the safety of their prisoners [ ], they are . . . responsible for taking reasonable measures to [e]nsure the safety of inmates."[36]  Accordingly, a jailer violates the Eighth Amendment if he shows deliberate indifference to a convicted inmate's serious medical needs.[37]  "Under the Fourteenth Amendment's due process clause, pretrial detainees . . . are entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment."[38]
>
> Claims arising from a failure to prevent prisoner suicide "are considered and treated as claims based on the failure of jail officials to provide medical care for those in

---

[34]*Id.*

[35]*Celotex*, 477 U.S. at 327, 106 S. Ct. 2548 (quoting Fed. R. Civ. P. 1).

[36]*Gaston*, 229 Fed. Appx. at 709-10, 2007 WL 1087281 at *6-7 (10th Cir. Apr. 12, 2007) (citing *Lopez*, 172 F.3d at 759 (internal citation omitted)).

[37]*Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

[38]*Id.* (citing *Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10th Cir. 1992); *Bell v. Wolfish*, 441 U.S. 520, 535 n.16, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)).

their custody."[39]  Thus, a plaintiff bringing such a claim must prove that his jailer was "deliberately indifferent to a substantial risk of suicide."[40]  "Deliberate indifference has objective and subjective components."[41]  The objective component of the test is met if the harm suffered was sufficiently serious.[42]  Obviously, suicide satisfies this requirement.[43]

The subjective component of the test requires a showing that the defendant acted with a culpable state of mind. In *Farmer v. Brennan*, the Supreme Court observed that the required mens rea lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other"[44]  The Court then held that "a prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[45]

[In *Farmer*], [t]he Court made clear that the defendant's knowledge of a substantial risk may be proven by circumstantial evidence, including evidence "that the risk was obvious."[46]  However, the threshold for obviousness is very high.[47]

---

[39]*Id.* (citing *Barrie v. Grand County*, 119 F.3d 862, 866 (10th Cir. 1997)).

[40]*Id.*

[41]*Id.* (citing *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006)).

[42]*Id.*

[43]*Id.* (citing *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) ("[I]t goes without saying that suicide is a serious harm.").

[44]*Id.* (citing *Farmer*, 511 U.S. at 836, 114 S. Ct. 1970).

[45]*Id.* (citing *Farmer*, 511 U.S. at 837, 114 S. Ct. 1970).

[46]*Id.* (citing *Farmer*, 511 U.S. at 842, 114 S. Ct. 1970).

[47]*Id.*; s*ee also, Perez v. Oakland County*, 466 F.3d 416, 435-36 (6th Cir. 2006) (Griffin, J., concurring) ("Admittedly, it may have been unwise to credit Perez's characterization of his state of mind and his explanation for discontinuing his medication, particularly in light of his history and his unmedicated state itself . . . .  [However, i]f one fails to perceive a strong likelihood, one cannot then be deliberately indifferent to it."); *Collins*, 462 F.3d at 761 ("[A] request to see a crisis counselor . . . is not sufficient to put a defendant on notice that an inmate poses a substantial and imminent risk of suicide.").

**b.       Procedural History:  Qualified Immunity Rulings in this Case**

**(1)       November 17, 2005 Memorandum and Order**

In its original Memorandum and Order, this Court applied the legal standards set forth above to the undisputed facts and concluded that neither Officer Roberts nor Sergeant Hollister were entitled to qualified immunity on Plaintiff's section 1983 claims.  In so finding, this Court acknowledged that both Officer Roberts and Sergeant Hollister denied knowledge of Belden's inclination toward suicide.  With that said, however, the Court found there was a genuine issue of material fact regarding whether the risk of Belden committing suicide was so substantial or pervasive that knowledge by Officer Roberts and Sergeant Hollister could be inferred.  More specifically, the Court concluded that the following evidence was sufficient for a jury to find that Belden was exhibiting strong signs of suicidal tendencies, that these two jail officials had actual – or inferred – knowledge of, or were willfully blind to, the specific risk that Belden would commit suicide, and that these jail officials then failed to take steps to address that known and specific risk:

• If the jailers had been properly monitoring the inmates, the jailers would have heard Belden talk about suicide, would have observed Belden give away his food, would have watched Belden repeatedly rock back and forth on his bed, and would have noticed Belden tying his shoelaces together to test the ability of the shoelaces to hold his body weight;

• Belden's change in behavior on August 14, 2002 was drastic compared to the prior six weeks, which should have raised suspicion that something was wrong;

• Officer Roberts was instructed to place Belden in cell 14, which was the suicide prevention cell, but this task was not accomplished in an expedient or reasonable fashion;

• Officer Roberts was instructed to notify dispatch that he needed assistance to remove the obstruction from Belden's cell, but Officer Roberts failed to do so;

- Regardless of whether the obstruction was removed, Belden should have – and could have – been monitored every half-hour, but was not; and

- Belden was allowed to remain in his cell with his window covered, which obstructed any observation into his cell, for at least approximately two hours and that such conduct is prohibited by jail policy and/or practices.

### (2)    The Tenth Circuit's Opinion on Appeal

Sergeant Hollister, Brandon Roberts' immediate supervisor, appealed the Court's decision that he was not entitled to qualified immunity.  On appeal, the Tenth Circuit concluded that the evidence in the record, viewed in the light most favorable to Plaintiff, failed to establish that Sergeant Hollister was deliberately indifferent to the risk that Mr. Belden would kill himself.  In the opinion, the Tenth Circuit made the following findings:[48]

> The Magistrate Judge relied on the following evidence in reaching the conclusion that Sergeant Hollister was not entitled to qualified immunity: (1) Mr. Belden's cellmates observed suicidal behavior and heard him discussing suicide; (2) Mr. Belden was not a disciplinary problem until the day of his death; (3) Mr. Belden received a letter from Ms. Renz on the day of his death and Sergeant Hollister was aware of the receipt and contents of the letter; (4) Sergeant Hollister had training in detecting suicidal inmates; (5) Sergeant Hollister placed Mr. Belden in a single-person cell; (6) Mr. Belden plugged the toilet in his new cell; (7) Officer Roberts told Sergeant Hollister about Mr. Belden's continued insubordination between 4:00 and 6:40 p.m.; (8) Sergeant Hollister instructed Officer Roberts to remove the paper from Mr. Belden's cell window and transfer him to Cell 14; (9) Cell 14 was the suicide watch cell; and (10) Sergeant Hollister never followed-up with Officer Roberts to check on the situation with Mr. Belden.

> Much of this evidence has no bearing on whether Sergeant Hollister knew that Mr. Belden was suicidal. For example, the magistrate judge noted that there was no evidence that Sergeant Hollister was aware of the suicidal behavior observed by Mr. Belden's cellmates. Indeed, the inmates uniformly stated that they had not told any jail officials about their observations because they did not believe Mr. Belden was suicidal. Nevertheless, the magistrate judge believed that a jury could find that:

---

[48]*Gaston*, 229 Fed. Appx. at 710-12, 2007 WL 1087281 at *8-9.

> [I]f the jailers had been properly monitoring the inmates, the jailers
> would have heard Belden talk about suicide, would have observed
> Belden give away his food, would have watched Belden repeatedly
> rock back and forth on his bed, and would have noticed Belden tying
> his shoelaces together to test the ability of the shoelaces to hold his
> body weight.

This is hardly a proper inference to be drawn from the evidence because it presumes that jailers have a constitutional duty to monitor inmates constantly. However, jailers are neither obligated nor able to watch every inmate at every minute of every day. The record is clear that Sergeant Hollister and his colleagues were not aware of the strange behavior described by Mr. Belden's cellmates. Under these circumstances, we would not permit a jury to infer that their failure to notice contributed to the "higher degree of fault than negligence" required for deliberate indifference.[49]

With respect to the letter from Ms. Renz, Sergeant Hollister testified that:

> A. He received a letter through the mail. It had been logged in by the jailers.

> Q. That letter, did anyone at the jail look at that before they gave it to him?

> A. Apparently so because the other dayshift jailer had mentioned it to me that ... [Ms. Renz] wanted to know why he wouldn't come to the window when she honked.

> Q. Did you ever observe that letter?

> A. I don't remember.

The letter is not in the record, and nothing in the record further illuminates its contents. Nevertheless, the magistrate judge seemingly presumed that it was a "Dear John" letter. This is pure speculation that finds no support in the record. According to Deputy Brammer, Ms. Renz arrived at the hospital soon after Mr. Belden was taken there.  She told the emergency room physician that she had spoken with Mr. Belden the day before and that "[h]e told her that he loved her but did not make any suggestion that he might be particularly depressed or suicidal."  From this evidence, a jury would have no basis for inferring that there was anything amiss in Mr. Belden's relationship with Ms. Renz, let alone that the defendants were aware of it and deliberately indifferent to its effect on his mental state.

---

[49] *Id.* (citing *Berry v. City of Muskogee*, 900 F.2d 1489, 1495 (10th Cir. 1990)).

Sergeant Hollister admitted that Mr. Belden was generally a well-behaved inmate prior to August 14, 2002, and he agreed that a sudden shift in behavior can be a harbinger of suicide.  However, he testified unequivocally that Mr. Belden's behavior did not dramatically change on the day he ended his life, and he viewed Mr. Belden's conduct as a disciplinary issue only. He explained: "I didn't know he was suicidal . . . . [H]e was just being uncooperative because he didn't want to be removed from that cell because I believe that that [sic] window had been altered to get contraband into the facility, so he didn't want to move because of possibly getting contraband." Sergeant Hollister further testified that, in light of his drug history, Mr. Belden could be expected to be angry about being moved into a cell in which he would not be able to receive contraband. Still, "[h]e wasn't that upset when I moved him. He argued the point. He said well I don't want to move . . . . He was never out of control. He did not yell or scream."

Nevertheless, Sergeant Hollister later ordered Officer Roberts to move Mr. Belden to Cell 14, the suicide watch cell. He also chose not to call Officer Roberts to verify that his orders had been carried out because "I didn't believe there would be a problem with him later. If he had a second jailer or an officer [with Officer Roberts] I didn't feel there was going to be a problem. He had already complied when two people were there."

Certainly, a jury would be entitled to disbelieve Sergeant Hollister's testimony. However, the rigorous deliberate indifference standard requires knowledge that an inmate is suicidal or a risk that is so obvious and substantial that knowledge can be inferred. We would not permit a jury to infer knowledge simply from the fact that Sergeant Hollister instructed Officer Roberts to move Mr. Belden to Cell 14 because it is undisputed that Cell 14 was not solely used as a suicide watch cell. Moreover, the record contains no evidence that Mr. Belden's behavior was unusual for an inmate, especially an inmate who had been deprived of his access to contraband and moved to an isolated cell without a working television. Sergeant Hollister's suicide prevention training left him sensitive to clues of possible suicide, but there is no evidence that Mr. Belden exhibited any of these tendencies. He simply was not an obvious suicide risk. Because there is no evidence that Sergeant Hollister considered Mr. Belden suicidal, he could not have been deliberately indifferent to the risk of suicide. Accordingly, we conclude that [Hollister] is entitled to qualified immunity.

In light of its decision that Sergeant Hollister was entitled to qualified immunity, the Court of appeals reversed and remanded the case to this Court with instructions to enter judgment on the 42 U.S.C. § 1983 claim in favor of Defendant Hollister.  Upon remand, and because the legal findings made by the Tenth Circuit on appeal are decidedly contrary to the legal findings originally

23

made by this Court under the same factual circumstances, Defendant Brandon Roberts filed a second motion for summary judgment.

### c.      Analysis of Qualified Immunity - Brandon Roberts

Upon consideration of Brandon Roberts' second motion for summary judgment, and applying the analysis set forth by the Court of Appeals in its opinion to the undisputed facts, the Court has no choice but to find that Brandon Roberts, like Sergeant Hollister, is entitled to qualified immunity. In support of this conclusion, the Court refers to the following unequivocal findings by the Tenth Circuit in its opinion: First, a jailer does not have a constitutional duty to monitor inmates constantly, and thus it would be improper to permit a jury to infer that a jailer's failure to notice contributed to the "higher degree of fault than negligence" required for deliberate indifference.[50]  Second, there is no evidence to suggest the letter from Belden's fiancé was a "Dear John" letter, and thus a jury would have no basis for inferring that there was anything amiss in Belden's relationship with his fiancé, let alone that any jailer was aware of it and deliberately indifferent to its effect on Belden's mental state.  Third, given the deliberate indifference standard requires knowledge that an inmate is suicidal or a risk that is so obvious and substantial that knowledge can be inferred, the Court of Appeals held it would not permit a jury to infer knowledge that Belden was suicidal simply from the fact that Sergeant Hollister instructed Officer Roberts to move Belden to Cell 14.  More specifically, the Court of Appeals found Cell 14 was not solely used as a suicide watch cell and that the record contains no evidence that Belden's behavior was unusual for an inmate.

Although made in support of the decision that Officer Hollister is entitled to qualified immunity, there is no question that each of the findings made by the Tenth Circuit in its opinion

---

[50]*Gaston*, 229 Fed. Appx. at 711, 2007 WL 1087281 at *8 (citing *Berry*, 900 F.2d at 1495).

apply just as equally to Defendant Brandon Roberts.  Although this Court previously made contrary findings under the facts presented and the applicable law, these findings are not now cognizable given the Court's obligation under the Tenth Circuit's mandate to accept and apply the Court of Appeals' determination.  Accordingly, this Court finds that Brandon Roberts is entitled to qualified immunity and summary judgment will be granted in his favor with regard to Plaintiff's 42 U.S.C. § 1983 claims.

### 4. Summary Judgment as to Plaintiff's Kansas State Law Claims

Commissioners Ploeger, Leitch, and Steve Roberts, Sergeant Hollister, and Sheriff Shoemaker argue they are entitled to summary judgment on Plaintiff's state law negligence claims pursuant to exceptions set forth within the Kansas Tort Claims Act ("KTCA").[51]  The KTCA, which makes governmental liability the rule and immunity the exception,[52] provides that each governmental entity shall be liable for the negligent or wrongful acts or omissions of its employees acting within the scope of their employment under the same circumstances that a private person would be liable.[53]  The governmental entity bears the burden to establish immunity under any one of the exceptions set forth in K.S.A. 75-6104.[54]

The referenced Defendants make the following assertions in support of immunity:

---

[51]K.S.A. 75-6103(a).

[52]*Dougan v. Rossville Drainage Dist.*, 243 Kan. 315, 318, 757 P.2d 272 (1988).

[53]K.S.A. 75-6104; *see also, Collins v. Bd. of Douglas County Comm'rs*, 249 Kan. 712, 720, 822 P.2d 1042 (1991).

[54]*Kansas State Bank & Tr. Co. v. Specialized Transp. Servs., Inc.*, 249 Kan. 348, 364, 819 P.2d 587 (1991).

(1)     Immunity due to performance of a discretionary function;[55]

(2)     Immunity based on the police protection exception;[56] and

(3)     Immunity based on an absence of actual fraud or actual malice by the county commissioners.[57]

As a preliminary matter, the Court notes that the arguments set forth by these Defendants related to the discretionary function and the police protection exceptions are identical to the arguments set forth in the first summary judgment motion filed by these Defendants.  For the reasons stated in this Court's Memorandum and Order[58] rejecting these exceptions, the Court again finds Defendants are not entitled to immunity from liability due to either the discretionary function or the police protection exceptions.  Thus, the only assertion in support of immunity that has not been previously addressed is Defendants' argument that Commissioners Ploeger, Leitch, and Steve Roberts are entitled to immunity from Plaintiff's state law claims pursuant to K.S.A. 75-6119.

The relevant portion of K.S.A. 75-6119 provides that "[a] member of any appointive board, commission, committee or council of a municipality who is acting within the scope of such member's office and without actual fraud or actual malice shall not be liable for damages caused by the negligent or wrongful act or omission of such member or board, commission, committee or council."[59]  Notably, the language in the statute appears to apply to individual members of the

---

[55]K.S.A. 75-6104(e).

[56]K.S.A. 75-6104(n).

[57]K.S.A. 75-6119(b).

[58]November 17, 2005 Memorandum and Order at pp. 22-25 (Doc. 36).

[59]K.S.A. 75-6119(b).

Commission and does not appear to apply to the County or Municipality as an entity. To that end, K.S.A. 75-6119 further provides:

> Nothing in this section shall be construed to affect the liability of a municipality for damages caused by the negligent or wrongful act or omission of the governing body, or any appointive board, commission, committee or council, of the municipality, or any member thereof, and the negligence or wrongful act or omission or any member of such a governing body, board, commission, committee or council, when acting as such, shall be imputed to the municipality for the purpose of apportioning liability for damages to a third party pursuant to K.S.A. 60-258a and amendments thereto.[60]

It seems clear that K.S.A. 75-6119 does not relieve Brown County – as an entity – from liability. It is unclear, however, whether the statute relieves Commissioners Ploeger, Leitch, and Steve Roberts from liability under the KTCA in their individual and official capacities. Notwithstanding this ambiguity, the Court finds it is inappropriate to resolve the liability issue in the context of this federal lawsuit. This is because, first, the Court has decided, *see infra*, to decline supplemental jurisdiction on Plaintiff's state law negligence claims.[61] Second, resolution of whether the Commissioners are individually and officially liable turns on interpretation of a state law, which – given the impending dismissal – is more appropriately analyzed and resolved by a state court. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's state law negligence claims will be denied.

## C.   Motion to Decline Supplemental Jurisdiction

In light of the mandate issued by the Tenth Circuit Court of Appeals requiring this Court to enter summary judgment in favor of Hollister and Shoemaker on Plaintiff's federal constitutional claims, as well as the decision by this Court on remand that summary judgment in favor of Brandon

---

[60]K.S.A. 75-6119(c).

[61]*See* discussion, *supra*.

27

Roberts is appropriate, the only surviving claims in this lawsuit are Plaintiff's state law negligence claims. Defendants argue the Court should decline to exercise supplemental jurisdiction over these state law claims. Plaintiff disagrees.

Pursuant to 28 U.S.C. § 1367(c)(3), a district court has discretion to decline to exercise supplemental jurisdiction once it has dismissed the claims over which it had original jurisdiction.[62] Now that Plaintiff's federal law claims have dropped from the case, their state law claims are no longer supplemental to any federal question claim.[63] "Under those circumstances, the most common response to a pretrial disposition of federal claims has been to dismiss the state law claim or claims without prejudice."[64] This is because "[n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary."[65]

Upon consideration of the arguments presented by counsel in the briefing related to issue, the Court finds no compelling reason for continuing federal jurisdiction in this matter and concludes judicial economy and fairness to the parties point strongly in favor of state court, rather than federal court, for the resolution of the remaining state law claims.[66] Accordingly, the Court will decline to exercise jurisdiction over the remaining state law claims.

---

[62]*Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1492 (10th Cir. 1995) (approving district court's dismissal of state-law conversion and breach of contract claims where defendants obtained summary judgment on plaintiff's gender discrimination claim).

[63]*See Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) (remanding state tort claims upon dismissal of plaintiffs' Title VII claim for sexual harassment).

[64]*Id.*

[65]*See Thatcher Enters. v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990).

[66]*See Ball*, 54 F.3d at 669.

To that end, the Court notes that Plaintiff will be free to pursue her claims in a Kansas court because, even if the statute of limitations would otherwise have run, 28 U.S.C. § 1367(d) tolls the statute of limitations during the time the claim is pending and affords them at least thirty days from a current federal court dismissal to commence a new action in the state court.[67]  In this case, because discovery is complete, the Court conditions dismissal on use of all discovery in any subsequently filed state court case.

It is therefore ordered by the Court that summary judgment in favor of Defendants is granted as to all Plaintiff's 42 U.S.C. § 1983 claims against all Defendants and thus such claims are hereby dismissed.

It is further ordered by the Court that because the Court declines to exercise supplemental jurisdiction in this case, Plaintiff's state law claims against all Defendants are dismissed without prejudice.

IT IS SO ORDERED.

Dated in Kansas City, Kansas on this 17th day of January, 2008.


s/ David J. Waxse
David J. Waxse
United States Magistrate Judge

cc:    All counsel and *pro se* parties

---

[67]28 U.S.C. § 1367(d). *Cf. Jinks v. Richland County, S.C.*, 538 U.S. 456, 466-67 (2003) (no constitutional doubt arises from holding that "[a] claim against . . . a political subdivision of a State [ ] falls under the definition of 'any claim asserted under subsection (a).'").  Kansas's "saving statute," K.S.A. 60-518, affords a plaintiff six months to commence a new action if a previous timely action failed "otherwise than upon the merits." Examples of such failures include dismissal without prejudice.  *See Rogers v. Williams, Larson, Voss, Strobel & Estes*, 245 Kan. 290, 293, 777 P.2d 836, 839 (Kan. 1989). If applicable, this time frame controls over the 30-day tolling period in 28 U.S.C. § 1367(d).